BAILEY *v.* LONDON GUARANTEE AND ACCIDENT COMPANY.

[No. 9,549. Filed December 13, 1918. Rehearing denied November 7, 1919. Transfer denied January 6, 1920.]

1. TRIAL.—*Directing Verdict.*—A motion for a peremptory instruction in favor of defendant should not be sustained, if, after eliminating all evidence favorable to plaintiff, there is any evidence remaining, which, with its legitimate inferences, would be sufficient to support each of the facts essential to a verdict for plaintiff if one should be returned in his favor. p. 90.

2. APPEAL.—*Review.*—*Scope.*—*Searching Record to Affirm.*—It is the duty of the court on appeal to search the record to affirm the judgment below, so that if the action of the trial court in giving a peremptory instruction can be upheld on any of the grounds stated by appellee, the judgment will be affirmed. p. 91.

3. FRAUD.—*Personal Injuries.*—*Procuring Release by Fraud.*—*Right to Relief.*—Where an injured employe of one carrying employers' liability insurance gave a release which he alleged was

obtained by fraud, he can obtain relief, in an action against the insurer, only where he shows that the fraud relied on was committed by the insurer, or with its knowledge or authority, or was adopted or ratified by it.   p. 98.

4.  PRINCIPAL AND AGENT.—*Agency.*—*Fraud.*—*Evidence.*—In an injured employe's action against the insurer carrying the master's indemnity, insurance for fraud in obtaining a release, evidence *held* to show that the persons obtaining the release from plaintiff represented defendant and were its agents for the purpose of making the settlement, in which the written release was to be secured, so that their fraud was imputable to defendant.   p. 101.

5.  FRAUD.—*Personal Injuries.*—*Procuring Release by Fraud.*—*Evidence.*—*Ignorance of Falsity of Representations.*—*Liability.*— Where an employe sustained a fractured leg, and a physician furnished by the employer in behalf of its insurer stated that there was a good union and that the employe would be able to go to work in a short time, and representatives of the employer and the insurer when visiting the employe repeated such statements and thereby procured a release, the fact that they did not know the falsity of such statements was not of controlling importance in an action by the employe against the insurer for fraud in procuring the release.   p. 101.

6.  FRAUD.—*Personal Injuries.*—*Procuring Release by Fraud.*—*Liability.*—Where an injured employe, after executing a release to the master, sued to recover for his injuries, and the employers' liability company insuring the master defended in the name of the employer, and, with full knowledge of the circumstances under which the release was obtained, set it up as a defense, thereby preventing the recovery of a judgment for which it would have been liable, the insurer was chargeable with any fraud practiced in securing the release.   p. 102.

7.  FRAUD.—*Personal Injuries.*—*Release.*—*Procuring by Representations.*—*Validity.*—Statements by the attending physician to an injured employe that there was a good union of the bones of a fractured leg, and that the limb was doing nicely, were not mere expressions of opinion as to the future course of the injury, but were representations of the then existing condition upon which the employe had a right to rely, and where he was induced to execute a release by means of such statements, and they were false, he could avoid the release.   p. 103.

8.  FRAUD.—*Release Procured by Fraud.*—*Knowledge of Fraud.*— Where an injured employe, relying on false statements as to his condition, executed a release, evidence in an action for fraud in obtaining such release, *held* not to show that he had ample opportunity to discover the facts as to his condition.   p. 104.

9. FRAUD.—*Release Procured by Fraud.—Knowledge of Fraud.—Evidence.*—Where an injured employe, induced by false statements as to his condition, signed a release, evidence in an action for fraud in securing the release, *held* to show that he relied on such false statements. p. 104.

10. FRAUD.—*Inducing Abandonment of Cause of Action by Fraud.—Right to Relief.*—Depriving a party of an existing cause of action by fraudulent representations furnishes a new cause of action, whereby he may keep what he has received and sue to recover damages for the fraud, or he may rescind, or offer to rescind, and recover on his original cause of action. p. 104.

11. FRAUD.—*Actions.—Damages.—Necessity of Proof.*—Where an injured employe was induced by fraud to execute a release, it was essential, in an action to recover for the fraud, to allege and prove pecuniary damage proximately resulting from the fraud. p. 105.

12. FRAUD.—*Actions.—Allegations and Proof of Damages.—Sufficiency.*—The requirement that pecuniary damages be alleged and proved in an action to recover damages for fraud is met by averments of the complaint, supported by evidence showing that an injured employe was fraudulently induced to execute a release, which was successfully interposed as a defense in an action against the employer for the injuries. p. 105.

13. FRAUD.—*Release Procured by Fraud.—Failure to Rescind.—Effect.*—Where an injured employe was induced by fraud to execute a release, and he subsequently sued his employer, who defeated the action by interposing the release as a defense, his failure to rescind by restoring what he had received in settlement for his injuries did not preclude a recovery of damages for the fraud. p. 106.

14. LIMITATION OF ACTIONS.—*Fraud.—Actions.—Jury Questions.—Lack of Diligence in Discovering Fraud.*—Where an injured employe was induced by fraudulent representations to execute a release, and more than six years thereafter brought suit to recover damages for the fraud, the question whether the action was barred by the six-year statute of limitations was for the jury, where there was evidence from which the jury might have inferred that plaintiff did not discover the fraud, or who was responsible for it within the period of limitation, and that his failure to make such discovery was due to the nature and character of the fraud, rather than to any lack of diligence on his part. p. 108.

15. APPEAL.—*Review.—Peremptory Instructions.*—In an action for fraud, where there was some evidence upon each of the elements essential to plaintiff's right to recover, the giving of an instruction directing a verdict for defendant was reversible error. p. 108.

From Marion Superior Court (93,610); *Linn D. Hay,* Judge.

Action by Ollie E. Bailey against the London Guarantee and Accident Company. From a judgment for defendant, the plaintiff appeals. *Reversed.*

*George W. Galvin,* for appellant.

*J. W. Fesler, Harvey J. Elam* and *Howard S. Young,* for appellee.

HOTTEL, J.—This is an appeal from a judgment in appellee's favor in an action brought by appellant in which he sought to recover damages alleged to have resulted from fraud practiced upon him by appellee.

The complaint is lengthy and it will be sufficient for the purposes of the questions presented by the appeal to indicate its general scope and tenor. It proceeds upon the theory that appellant, on April 8, 1907, while in the employ of the Indianapolis Abattoir Company, as a helper on one of its wagons engaged in the delivery of meats in the city of Indianapolis, was kicked and injured by a fractious and dangerous horse, carelessly and negligently furnished and used by said company, without any warning to appellant or any knowledge on his part of its said dangerous character and habits; that by such kick appellant received a broken leg and other injuries, on account of which he suffered great pain, etc., all to his damage, etc.; that for such damages he had a good and valid cause of action against the Abattoir company; that appellee is an insurance company, and as such had issued to the Abattoir company a policy of insurance, indemnifying it against loss growing out of injuries to its employes; that by the terms of

said policy appellee had undertaken and agreed to defend all actions for personal injuries brought against the Abattoir company by any of its employes, but withheld from such company, and reserved to itself, all rights in the matter, control and settlement of claims and the incurring of expenses connected therewith growing out of said injuries, giving, however, to said company the right to provide at appellee's expense at the time of the accident "such immediate surgical relief as is imperative"; that said policy provided that in case of accident and injury to one of its employes, the Abattoir company should give immediate notice thereof to appellee; that pursuant to this provision of the policy appellee was given immediate notice of appellant's injury; that at appellee's instance and for and on its behalf, the Abattoir company employed one Emanuel H. Gebauer, a physician and surgeon of Indianapolis, who took charge and control of appellant and undertook the care and treatment of his injuries for and on behalf of appellee; that from and after the accident appellee took complete charge and control of said case and assumed to act for the Abattoir company; that after being so treated by said doctor for said injuries for some time appellant, in August, 1907, was induced by appellee through the false and fraudulent representations of its said physician and surgeon to settle with said Abattoir company and execute to it a release, purporting to be in full settlement for his said injuries, appellant, however, at the time believing that he was merely receipting for a sum in gross that would cover his wages during future disability; that, after said settlement, appellant was required to submit to a surgical operation in which his

leg was amputated, and he then learned the true nature and condition of his injuries and brought suit against the Abattoir company for damages resulting therefrom; that in the trial of said action against the Abattoir company said release was successfully interposed and used as a defense to appellant's cause of action. There are also averments to the effect that appellant had confidence in said doctor, and relied on his representations and by them was induced to make said settlement; that he continued to treat appellant until in February, 1908, when he, appellant, consulted other surgeons, and then for the first time learned that there never had been any union of the bones of his leg.

To this complaint there was an answer in general denial, and an affirmative paragraph setting up the six-year statute of limitations. There was a reply to the latter answer in general denial, and also a special reply setting up facts showing concealment by appellee of appellant's cause of action on account of which appellant was unable to ascertain the facts giving rise thereto until a time within said statutory period.

On the issues thus formed the case was submitted to a jury for trial. At the close of appellant's evidence, the court, on appellee's motion, instructed the jury to return a verdict for appellee, which was done and judgment rendered accordingly. A motion for a new trial was overruled. This ruling is assigned as error, and relied on for reversal. While said motion contains several grounds, they in effect present the same question, viz., the correctness of the action of the trial court in giving a peremptory instruction in appellee's favor.

We deem it unnecessary to enter into any lengthy discussion of the question, when such action is justified by the trial court. This court has given

1. this question consideration and collected and cited the authorities pertinent to its determination in the case of *Lyons* v. *City of New Albany* (1913), 54 Ind. App. 416, 103 N. E. 20. The court in that case announced as its conclusion, as to the effect of the authorities pertinent to said question, that the trial court "should not have sustained such motion if, after eliminating all evidence favorable to appellee, there was any evidence remaining which, with its legitimate inferences, would have been sufficient to support each of the facts essential to a verdict for appellant if one had been returned in her favor."

Appellee in effect concedes the law to be as stated, and in recognition thereof asserts under its propositions and points, in substance, as follows: (1) That there is a complete failure to show that appellee was in any way responsible or liable for the statements set out in the complaint as fraudulent. (2, 3) That the evidence fails to show false statements within the meaning of the law governing such cases. (4) That the evidence shows that appellant had ample opportunity to discover the facts as to his condition and injury, and hence cannot successfully claim to have been defrauded. (5) That there was no evidence to show that appellee expected appellant to rely on any representation made by Dr. Gebauer, and that the absence of such evidence is fatal to appellant's cause. (6) The evidence fails to show that appellant relied on the statements alleged to have been false. (7) That appellant failed to make a sufficient showing that he suffered any damage because of the alleged

fraud practiced on him. (8) The evidence shows that appellant's action was barred by the Statute of Limitations.

It is the duty of this court to search the record to affirm the judgment below, and hence if the action of the trial court in giving said instruction can be upheld upon either one or more of the grounds or propositions, *supra,* it will be our duty to affirm its judgment.

As pertinent and applicable to an intelligent disposition of said propositions, we will now indicate some of the evidence which we think favorable to appellant. The evidence shows that appellant was injured April 8, 1907. The policy read in evidence provides, among other things, for liability on account of an accident resulting in bodily injury or death to one person in a sum not exceeding $5,000; after which are provisions as follows:

"Extra benefits and surgical aid.

"B. In addition to these limits the Company will pay for the providing at the time of accident of such immediate surgical aid as is imperative, and also will pay all cost and expense attendant upon its investigation, adjustment and settlement of claims.

Notice of accident and claim.

"* * * C. Upon the occurrence of an accident the assured shall give immediate written notice thereof, with the fullest information obtainable at the time, to the Company's Head Office, or to the agent who has countersigned this policy. If a claim is made on account of such accident, the

assured shall give like notice thereof, with full particulars. The assured shall render to the company all co-operation and assistance in his power in the protection of his interests.

### When assured is sued.

"* * * D. If thereafter any suit, even if groundless, is brought against the assured to recover damages on account of such injuries or deaths as are covered by this policy, the assured shall immediately forward to the company every summons or other process served upon him, whereupon the company will, at its own cost and expense, defend against such suit in the name and on behalf of the assured, unless the company shall elect to settle the same or pay to the assured the indemnity as provided for in clause A of this policy.

### Settlements.

"* * * F. The assured may settle any case at the assured's own expense, giving immediate notice thereof in writing to the company, and the assured may settle any case at the company's expense, if the company shall have previously given its consent in writing."

Appellant also introduced in evidence a statement, bearing date June 24, 1907, held by the Indianapolis Abattoir Company, rendered by Dr. Gebauer *for professional services rendered to date $45*. This statement contains the following memoranda at the close thereof.

"Apr. 8/07    Paid in case of O. E. Bailey
              injured at Indpls. Abattoir

> > Co. compound fracture of
> > right leg.
>
> Approved.
> C S W   45.00
>
> Charge                               Total
> Received Payment.................8/1/1907
> 90112
> Jul 26   1901   313          ` E. H. Gebauer.''

Exhibit 3 introduced in evidence is appellee's check payable to "Emanuel H. Gebauer, M. D." for $47, and indorsed by him and "paid through Chicago Clearing House," August 3, 1907.

Mr. Allerdice, the president of the Abattoir company, testified in effect that, after said accident, a report of it was sent to appellee; that after this report an attorney for the insurance company had the matter in charge and that thereafter the Abattoir company in no way interfered, but left the matter to appellee; that the Abattoir company employed no attorney; that when suit was filed against his company in March, 1909, the service on it was turned over to appellee's attorneys, who were in no way employed by the Abattoir company; that he, as president of the Abattoir company, did not obtain the release from appellant and paid him nothing, except his wages for fifteen or twenty weeks after his injury and a contribution for his limb; that said release never came into his possession as president of said company, and the Abattoir company had nothing to do with the employment of Elam and Fesler, attorneys in said case; that the Abattoir company had nothing to do with the care of appellant during his injury, and had nothing to do with the law suit after the matter was

turned over to appellee, except he appeared as a witness in obedience to a subpoena; that he had nothing to do with dictating the issues in said case and gave no instructions as to the pleadings to be filed.

The appellant testified in effect that Dr. Gebauer told him from time to time that his leg was *"doing nicely"; that he had a good union* and that it would be only a short time until he would be able to go to work again and be all right; that Mr. Lawrence, the wagon foreman in the pork department of the Abattoir company, told him about two days after his injury that he would be taken care of; that his wages would continue right along until he was able to go back to work; that they paid his wages for eighteen weeks and at the end of this period Mr. Allerdice, president of the Abattoir company, and Mr. Remster visited him; that on this occasion Mr. Allerdice told him that he was informed by Dr. Gebauer that his leg was doing nicely; that it was only a matter of a short time until he would be able to go back to work, and that they would have to cut off his salary, and he made him a proposition to accept $150, which would cover a period of fifteen weeks, and asked him to sign a paper releasing claims; that Mr. Remster was there at this time; that Dr. Gebauer was treating him frequently at this time; that he asked time to consider the matter and then a few days later again went to Dr. Gebauer and again asked him what he actually thought of his leg, that the matter was getting serious and that he wanted to know about it; that the doctor laughed and said, "Your leg is getting all right and it will be all right"; that he told him about the company stopping his pay and about the offer they had made him; that the doctor then said, "The bone would be all right

\* \* \* just take a little time. It was a matter of time until these bones would all be knit and I could do away with the brace and that I would be in good shape \* \* \* practically as good as before \* \* \* there might be a little shortage in the limb but I would be in good shape; that long before that money could be used up, that $150, or fifteen weeks' pay, I would be working again, my leg would be all right \* \* \*." That a week after that the doctor came to his house when his father and mother were present and asked "if I had made any further settlement. I said I had not." And he, the doctor, then advised him, appellant, to accept that money and told him *he had good union in his leg,* and that it would be only a matter of short time until those pains would all cease and he would have money left when he when back to work again. He, at this time, "had my leg exposed and was making an examination"; that two or three days later Mr. Remster came to his house and wanted to know "if I had made up my mind about that settlement \* \* \* and offered to raise the price $50 and make it $200, which would, as we figured it over, he and I, would carry me up until about the holidays, twenty weeks." That he took the $200 and signed the release, but did not read it; that Dr. Gebauer continued to treat his limb up until in January; that in the meantime he had gone back to work and had worked three weeks on the freight elevator and three weeks in the department, trimming meat; that during this time his pain was terrible; that Dr. Gebauer continued to treat him and gave him assurance that his leg was getting along all right. Appellant then says that he suggested an X-ray examination and the doctor laughed at him and said, "It

was absolutely unnecessary,'' and ''when I told him
that if he would not go with me to get such an exam-
ination, I would go myself, he said that if I did he
would not treat me any further.  I then consulted
Dr. John Oliver and he used an X-ray and got a pic-
ture of my leg and ordered me to the hospital for an
operation.''   This picture showed the bone over-
lapped and ''every time I stepped these bones would
gradually slip a little farther.''  There was no union
of the end of the bones.  At the hospital they first
sawed off the ends of the bones and wired them to-
gether, and again put the limb in a plaster cast.  This
cast was removed three times in a period extending
over about ten weeks.  On the last removal of the
cast the wires were removed and it was found that
there had been no union, with the result that ampu-
tation became necessary.  The limb was amputated
eight inches below the knee, May 18.  ''The first
knowledge I had that there was no union of the bones
was when the X-ray picture was taken.''

Appellant's wife, Ollie E. Bailey, testified in effect
that she remembered the occasion when Mr. Allerdice
and Mr. Remster came to their house the first time
and made the $150 offer; that they asked her husband
to take the money as wages and that would save her
from going over and drawing his money each week;
that if he took the lump sum he would have money
when he was able to go to work; that *they told him
the doctor said he would be able to go to work in a
short time, that he had a good union.*  ''One of them
said this, I don't remember which one.''   She also
testified in effect that she was with her husband at
their home and at Dr. Gebauer's office when he ad-
vised her husband to take the $150 offered him, and

told him that he would have money left when he was able to go to work; *that he had a good union of the limb.* Appellant and his wife both testified in effect that they had complete confidence in Dr. Gebauer, relied on his statements and by them was induced to make said settlement, and execute said release. There was also evidence from which the jury might have inferred that Doctor Gebauer was the only doctor who had examined and treated the injury, and that they knew nothing about the condition of the limb except what they learned from him, until they went to see Dr. Oliver, and obtained the X-ray examination.

The opinion of this court in the case of *Indianapolis Abattoir Co.* v. *Bailey* (1913), 54 Ind. App. 370, 102 N. E. 970, was also read in evidence.

Dr. Oliver testified in effect that when he first saw appellant he found a nonunion of the bones of his limb. They were lapped more than an inch; that in case of a broken bone such as that here involved there should be a union in three or four weeks to such an extent that "one could see that you would likely have a union"; that the simplest means of determining whether there has been a union of bones is to use the fingers; that by this means after the swelling subsides you can form a fairly definite idea; that the X-ray furnishes a definite means.

We now direct our attention to appellee's points or propositions indicated, *supra.* In support of its first proposition it is insisted that the only fraudulent statements alleged in the complaint or shown by the evidence are those of Dr. Gebauer and that the evidence fails to disclose that he had any connection with appellee at the time such statements were made;

that the doctor was not appellee's agent for any purpose, and especially not its agent for the purposes of negotiating a settlement of said claim, and that there is no evidence showing any adoption or ratification of said statements by appellee.

We recognize the general principle controlling in cases of this character which makes relief therein possible only where it is shown that the fraud relied on was committed by the party charged, or with his knowledge or authority, or was adopted or ratified by him. 12 R. C. L. 399; 20 Cyc 84.

3.

We also recognize that inasmuch as appellee, the party charged in this case, is a corporation, any fraudulent representations charged against it must have been representations of its agent or agents, and we think it may be conceded, as appellee contends, that the only false representations charged against it are those made by Dr. Gebauer.

It follows therefore that we must determine: (1) Whether there was any evidence from which the jury might have properly inferred that in his treatment of appellant Dr. Gebauer was appellee's agent. (2) If so, did his agency extend beyond such treatment and authorize the representations alleged to have been made? (3) If not, did appellee adopt or ratify such representations?

It will be observed that by the provisions of the policy above set out the appellee not only made itself liable for such immediate surgical aid as was imperative and provided at the time of the accident, but also required of the Abattoir company that it give immediate written notice of the accident with the fullest information obtainable at the time, and also required

of it that it should render to appellee all co-operation and assistance in its power in the protection of appellee's interest.

It also appears from the evidence that through the Abattoir company Dr. Gebauer's services were first procured. It further appears, however, that immediately after the accident the Abattoir company, in accord with the terms of said policy, notified appellee thereof and that it then took full and complete charge of said case. The Abattoir company had nothing further to do with the case. Dr. Gebauer continued his services up to and long beyond the time of the settlement. The only evidence of payment for said services was that made by appellee as evidenced by the receipted statement, *supra,* for $45, and the check for $47. The statement bears date *June 24, 1907,* and shows it to be for "professional services *rendered to date*" and receipted by the doctor on August 1, 1907. The check bears date July 26, 1907, and was paid August 3, 1907. The release bears date August 22, 1907. This evidence furnished ground for inference at least that the doctor was the agent of appellee in the treatment of appellant.

Waiving the question of the authority of the doctor in the first instance to bind appellee by any representations he may have made by way of inducing the settlement agreed to, and the release signed by appellant, we direct our attention to the question of the adoption and ratification of such representations. As pertinent to this question, this court in the case of *Nat. Life Ins. Co.* v. *Headrick* (1916), 63 Ind. App. 54, 58, 112 N. E. 559, said: "Ratification means the adoption of that which was done for and in the name of another without authority. It is in the nature of

a cure for lack of authorization. When ratification takes place the act stands as an authorized one and makes the whole act, transaction, or contract good from the beginning. Ratification is a question of fact and ordinarily may be inferred from the conduct of the parties. The acts, words, silence, dealings and knowledge of the principal as well as many other facts and circumstances may be shown as evidence tending to warrant the inference or finding of the ultimate fact of ratification. * * * Knowingly accepting benefits of an unauthorized employment amounts to a ratification of such contract of employment, and is in the nature of an estoppel to deny the authority to make such contract. * * * ratification may be inferred from affirmation or from passive acquiescence, or from the receipt of benefits with knowledge.''

As before indicated, the policy of insurance here involved not only authorized but required of the Abattoir company that it render all co-operation and assistance in its power in the protection of the interests of appellee, and in the matter of settlement authorized the Abattoir company to settle any case at appellee's expense, provided appellee's consent in writing to such end was first obtained. There was evidence also to the effect that immediately after the accident the case was turned over to appellee; that it then took full and complete charge and control of the case; that a short time before the release was executed appellant was visited at his home by Mr. Remster, appellee's attorney, and Mr. Allerdice, the president of the Abattoir company, and that they then made him a proposition of settlement, and asked him

to sign a paper releasing the Abattoir company from liability. It cannot be seriously contended in the light of this evidence but that each of these gentlemen represented and were the agents of appellee for the purposes of making the settlement in which the execution of the *written release* which they then had for signature was to be secured.

The evidence, *supra,* also shows, or tends to show, that one of these gentlemen then said to appellant in the presence of the other, in substance, that the doctor told him that he, appellant, was doing nicely, that he "would be able to go to work in a short time \* \* \* *that he had a good union.* This evidence would have at least warranted the jury in inferring that appellee's agents who made the settlement had at that time not only obtained the opinion of said doctor as to the condition of appellant's injury and the probability of his early recovery therefrom, but that they also used this opinion to induce the settlement and the execution of the release. It is true that it was not shown that either of said gentlemen were then informed as to the falsity of such representations of the doctor, but, under the facts of this case and the authorities hereinafter cited, the absence of this item of evidence is not of controlling importance.

Under and pursuant to the terms of its policy, indicated *supra,* appellee appeared and defended in the name of the Abattoir company a suit against the latter company. In its defense thereof it filed a special answer in which it set up the said release. Appellant in that action filed a special reply in which it charged that such release was induced and procured

by the fraudulent representations now relied on in this action. In the trial of that case appellee offered said release in evidence and by it was enabled to and did defeat recovery by appellant in such original action. These facts appear from the opinion in the case of *Indianapolis Abattoir Co.* v. *Bailey, supra,* introduced in evidence in this case.

It appears from this opinion, or at least the jury might have inferred from it, that, whether the appellee expressly adopted and ratified the acts and words of all those whose representations induced said release or not, it with knowledge of the facts set up in said reply defeated appellant in his said original action from recovering damages which he might otherwise have recovered, and at the same time prevented a judgment against the Abattoir company for which appellee would have been liable to the Abattoir company, and hence under the law, is in any event chargeable with the fraud alleged to have entered into the inducement of the execution of such release. *Green* v. *Des Garets* (1913), 210 N. Y. 79, 103 N. E. 964; *Taylor* v. *Commercial Bank* (1903), 174 N. Y. 181, 188, 66 N. E. 726, 62 L. R. A. 783, 95 Am. St. 564; *Krumm* v. *Beach* (1884), 96 N. Y. 398, 404, 405; *Jones* v. *Jones* (1890), 120 N. Y. 589, 598, 600, 24 N. E. 1016; *Fairchild* v. *McMahon* (1893), 139 N. Y. 290, 34 N. E. 779, 36 Am. St. 701; *Brown* v. *Ocean Accident, etc., Corp.* (1913), 153 Wis. 196, 140 N. W. 1112; *Nat. Life Ins. Co.* v. *Headrick, supra; Indiana Union Trac. Co.* v. *Scribner* (1911), 47 Ind. App. 621, 629, 631, 93 N. E. 1014; *Garner* v. *Mangam* (1883), 93 N. Y. 642; 16 Cyc 786.

In the case first cited, *supra,* the Court of Appeals of New York uses the following language, which we

think pertinent and controlling in the instant case: " 'It is an established principle of law that where a person acts for another who accepts the fruits of his efforts, the latter must be deemed to have adopted the methods employed, as he may not, even though innocent, receive the benefits and at the same time disclaim responsibility for the fraud by means of which they arose.' * * * The expression of the principle denotes the reasons which gave it existence. The deceit wrongs him subjected to it precisely as it would if the vendor himself had accomplished it. No just reason permits the vendee to be a loser by it. The vendor, who, having the power to repudiate the transaction, adopted and carried it through and received the benefits of the fraud, should be the loser. He in adopting and retaining a share of the product of the fraud adopts the agency and methods which brought it to a consummation."

In the instant case the appellee, by the use of the release alleged to have been fraudulently induced and obtained, secured and still retains the benefit of a judgment which relieved it from any possible liability on account of the original action.

We next direct our attention to appellee's second and third propositions indicated, *supra*. In support of these propositions it is insisted that the representations made by the doctor were merely the expressions of opinion and predictions as to the future, and hence furnish no ground upon which to base fraud. Some border-line cases affecting this question are cited in support of this contention, but none of them go to the extent of holding that representations of the character above set out, where falsely made, will not support a charge

of fraud based thereon. In the instant case the representations were not in fact mere expressions of opinion by way of predictions as to the future course of appellant's injury, but they were representations of a then existing condition, namely, that there was a good union of the bones of said limb and that the limb was doing nicely. Coming from one whose profession and whose relation to appellant and his injury were such as to afford him special knowledge on the subject, and make him capable of stating with substantial accuracy the condition of the limb as it then existed, the appellant had a right to rely upon said representations. *Brown v. Ocean Accident, etc., Corp., supra,* and cases there cited.

As affecting the question of correct measure of damages in such cases, see: *Gould* v. *Cayuga, etc., Bank* (1885), 99 N. Y. 333, 2 N. E. 16; *Sovereign Camp, etc.* v. *Latham* (1915), 59 Ind. App. 290, 107 N. E. 749.

The evidence indicated and the authorities cited herein furnish a sufficient answer to propositions 4, 5 and 6, *supra.* We therefore next direct our attention to proposition No. 7.

The authorities all agree that depriving one of an existing cause of action by fraudulent representations furnishes a new cause of action, in which two remedies or courses are open, either of which may be pursued by the injured party, vis.: "He may keep what he has received and sue to recover damages for the fraud, or he may rescind, or offer to rescind and recover on his original cause of action." *Indianapolis Abattoir Co.* v. *Bailey, supra,* and cases there cited; *Gould* v. *Cayuga, etc., Bank, supra;* 20 Cyc 86-95; *Nysewander* v. *Lowman*

(1890), 124 Ind. 584, 24 N. E. 355; *Cohoon* v. *Fisher* (1897), 146 Ind. 583, 44 N. E. 664, 45 N. E. 787, 36 L. R. A. 193; *Home Ins. Co.* v. *Howard* (1887), 111 Ind. 544, 13 N. E. 103; *Travelers' Protective Assn., etc.* v. *Smith* (1913), (Ind.) 101 N. E. 817, 820; *Sovereign Camp, etc.* v. *Latham, supra,* and cases there cited.

In the instant case appellant seeks to recover the damages sustained on account of the fraud. We recognize that in this, as in all cases predicated on fraud, it was essential to allege and prove some pecuniary damage to the deceived party proximately resulting from the fraud practiced upon him. *Bodkin* v. *Merit* (1885), 102 Ind. 293, 298, 1 N. E. 265; *Srader* v. *Srader, Admr.* (1898), 151 Ind. 339, 51 N. E. 479; *Board, etc.* v. *Garrigus* (1905), 164 Ind. 589, 598, 73 N. E. 82, 74 N. E. 249; 14 Am. and Eng. Ency. Law (2d ed.) 145, 179; 20 Cyc 137; *Hartford Life Ins. Co.* v. *Hope* (1907), 40 Ind. App. 354, 81 N. E. 595, 1088; *Jex* v. *Straus* (1890), 122 N. Y. 293, 25 N. E. 478.

This proposition is fully met by averments of the complaint and the evidence tending to support them, which show that appellant surrendered and lost his original cause of action against the Abattoir company, and on account thereof suffered the damages alleged. Upon this question the court in the case of *Travelers' Protective Assn. etc.* v. *Smith, supra,* at page 820, quotes with approval from the case of *Gould* v. *Cayuga, etc., Bank, supra,* as follows: " 'There having been no rescission of the compromise agreement, that must stand, and it discharges forever the original contract and extinguishes all right to any balance due upon it. In no

form of action while the compromise stands can that balance be recovered. Because of that fact it does not follow that merely nominal damages resulted from the fraud. While their measure is not the extinguished balance and cannot be without making the rule as to rescission an idle and useless formality, its measure is indemnity for the real loss sustained, which may very well prove to be less, and even much less, than the contract balance. Such damages will compensate the fraud as make the compromise, which is to stand, an honest and fair one, instead of a dishonest and fraudulent one. Damages which leave it to stand but purge it of fraud are what should be recovered." See, also, *Taylor* v. *Commercial Bank.* *supra.*

It is suggested that, if appellant had restored what he received in said settlement, or took the necessary steps to rescind, he could have recovered upon

13. his original action, and hence that his own failure and neglect in this respect is the cause of his damage rather than the fraud practiced upon him, and that by such failure and neglect he has deprived himself of his right of action for damages resulting from the fraud. No authorities are cited which sustain this contention, nor do we think any can be found. Indeed, we find no exception to the general rule recognized in all jurisdictions which gives to the party on whom the fraud has been practiced the choice of the remedies before indicated. There might be some reason for saying that in an action like this the person guilty of the tort or wrong might, by proper steps to undo it, that is, by restoration and an offer to rescind, relieve himself of the consequences of his fraud, and thereby force the

party so defrauded to sue upon his original action, but we believe no good reason can be suggested for placing upon the injured or defrauded party the burden of undoing or attempting to undo the wrong practiced upon him before he may have the right to sue for the damages resulting therefrom. The effect of such a holding would be to deprive him of his remedy for damages and hence would be in violation of the rule indicated, *supra*, as of universal application in such cases. We are not unmindful of the general principle of law applicable in cases of abrogation or breach of contract, and likewise in certain tort cases, which will not permit the injured party in such cases to sit idly by when in a position to act for his own relief, and then recover as damages for such tort or breach of contract the loss resulting from his own inaction. *Hall* v. *Paine* (1916), 224 Mass 62, 112 N. E. 153, 155, L. R. A. 1917C 737, and cases there cited; *Lowrie* v. *Castle* (1916), 225 Mass. 37, 113 N. E. 206, 209, and cases cited; *Gray* v. *Boston, etc., R. Co.* (1913), 215 Mass. 143, 102 N. E. 71. There is nothing in any of these cases, however, that can be said to either directly or indirectly hold that such injured party must himself undo or take the steps necessary to undo the wrong which caused his injury before he can recover damages resulting therefrom. We know of no diligence or affirmative action required of the injured party in such cases in order that he may avail himself of his action for damages, other than that he must bring it before the expiration of the statutory period.

This brings us to a consideration of appellee's proposition 8, *supra*. The settlement here charged

as fraudulent, and the release executed as a part thereof, were made and executed in August, 1907. This action was filed on January 26, 1914, and more than six years after the alleged fraud, but there was evidence from which the jury might have inferred that appellant never discovered the fraud, or who was responsible for it until within said period, and that his failure to make such discovery was due to the nature and character of the fraud, rather than to any lack of diligence on his part. This evidence was sufficient to carry such question to the jury, and entitled appellant to its conclusion and decision thereof. *Dorsey Mach. Co.* v. *McCaffrey* (1894), 139 Ind. 545, 38 N. E. 208, 47 Am. St. 290; *Lyons* v. *City of New Albany, supra; Drebing* v. *Sahrt* (1914), 55 Ind. App. 492, 104 N. E. 46.

Finally, we think that there was some evidence upon each of the elements essential to appellant's right to recover, and hence that the case should not have been taken from the jury by a peremptory instruction in appellee's favor; and for the error resulting in the giving of such instruction the judgment below is reversed, with instructions to the trial court to sustain appellant's motion for new trial, and for such other proceedings as may be consistent with this opinion.

Dausman, C. J., Caldwell, Ibach and Felt, JJ., concur. Batman, P. J., dissents.